## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

NIGEL KINTE WRIGHT,

                Petitioner,                Case Number: 2:12-CV-14164
                                              HON. ARTHUR J. TARNOW

v.

STEVEN RIVARD,

                Respondent.
_____/

## OPINION AND ORDER CONDITIONALLY GRANTING
## PETITION FOR WRIT OF HABEAS CORPUS

       This matter is before the Court on Petitioner Nigel Kinte Wright's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Wright challenges his convictions for first-degree murder and carrying a concealed weapon. The Court finds that Wright was denied his right to the effective assistance of counsel when trial counsel failed to raise a Confrontation Clause claim concerning the admission of the victim's out-of-court statements to a police officer. And, the Michigan Court of Appeals' conclusion to the contrary was an unreasonable application of *Strickland v. Washington*, 466 U.S. 668 (1984). The Court further finds that trial counsel's ineffectiveness and the resulting prejudice excuse Wright's procedural default of his independent Confrontation Clause claim. Finally, the Court finds a violation of the Confrontation Clause and holds that the violation was not harmless error. The Court grants a conditional writ of habeas corpus.

## I. Facts

Wright's convictions arise from the shooting death of Travis Goodwin during the early morning hours of December 29, 2007.  The prosecution alleged that Wright aided and abetted Patrick Pickett (also known as "Worm") and Shondell Dalton (also known as "Black"), in the shooting of Travis Goodwin, who was shot while sitting in a parked van outside his mother's home on Kimberly Street in Detroit.  The prosecution alleged that Wright drove Pickett and Dalton to the scene and, after the two men shot Goodwin, drove them away from the scene.[1]

Alice Smiley, Travis Goodwin's mother, testified that Goodwin lived with her until his death.  During the early morning hours of December 29, 2007, Smiley was awakened in her home on Kimberly Street by gunshots.  She then heard a knock at her door.  Dawayne Currie, who lived next door, told her that Goodwin had been shot.  Smiley was able to see her son before he was taken to the hospital, where he remained until he died on January 10, 2008, never having regained consciousness.

Smiley testified that she had known Wright since he was born and that Wright and her son had been friends when they were younger, but had become enemies by the time Goodwin was shot.  Wright's grandmother lived a few houses away from Smiley and

---

[1]  Co-defendants Pickett and Dalton were charged in the same felony information as Wright, but the charges against them were dismissed at the close of the preliminary examination because there was insufficient probable cause as to their identity as the shooters.  *See People v. Wright*, No. 288975, 2010 WL 5373811, *1 (Mich. Ct. App. Dec. 28, 2010).

2

Wright visited her once or twice a week.  Smiley saw Currie several times after the shooting, but he never told her what he had seen that night and never identified Wright as the shooter.

Smiley testified that a fire destroyed a known drug house on the street adjacent to her own within two weeks before the shooting.  The following day, Goodwin told her that the destroyed house was Worm's (Pickett's), and that Goodwin was concerned that "they" were going to think that he had caused the fire.

Detroit police officer Michael McGinnis testified he responded to the shooting on Kimberly Street.  He interviewed Currie at the scene.  Currie informed him that the shooters' vehicle was a dark-colored 1980's model Grand Prix.  Currie informed Officer McGinnis that the van was shot up less than a minute after Goodwin parked it.  Currie saw three individuals outside the Grand Prix, but only two were carrying weapons.  The only description Currie gave of the vehicle's driver was that he was a black male.  Currie did not mention that the two shooters wore ski masks or that the driver had braids.

Alfred G. Thomas testified that he is a Detroit police officer.  He and his partners responded to the shooting of Travis Goodwin.  The prosecutor asked Officer Thomas if, when he responded to the shooting, he had any suspicions that Wright was involved.  Defense counsel objected.  Outside the jury's presence, the prosecutor stated that she intended to ask Officer Thomas whether he was aware of any feuds between Wright and Goodwin that preceded the shooting.  The prosecutor made the following offer of proof: Officer Thomas testified that, a couple of months before the shooting, Goodwin

3

"indicated on general stops in the neighborhood that he was having problems in the neighborhood with a couple of guys that frequent the area of Clarendon as well as Mackinaw." Tr., 8/25/08 at 261. Goodwin identified the men with whom he had problems as: Wright, Damien Bell, and Tommy Dickey. *Id.* at 262. Goodwin described the trouble as involving "passing stares, looks." *Id.*

At the conclusion of the offer of proof, defense counsel argued that the testimony was inadmissible because it had no probative value, the prejudice was extreme, and Officer Thomas was biased because he was acquainted with several members of the victim's family. The prosecutor argued that the testimony was admissible under the state of mind of the deceased hearsay exception. The trial court held that Goodwin's statements to Officer Thomas were admissible.

The jury was returned to the courtroom and Officer Thomas testified about Goodwin's out-of-court statements. Officer Thomas testified that approximately three to four weeks before the shooting, Goodwin told Officer Thomas that he was receiving threats from three individuals in the neighborhood. Goodwin identified those three individuals as Wright, Damien Bell, and Tommy Dickey. Officer Thomas recalled that Goodwin said the conflicts arose because these individuals were expanding their territory for their drug business. Officer Thomas learned that Goodwin died from his injuries on January 10, 2007. After a warrant was issued for Wright's arrest, Officer Thomas arrested Wright on February 7, 2008. Wright was driving a black Dodge Charger at the time of his arrest and his hair was in braids.

4

Dawayne Currie testified that he lived on Kimberly Street, next door to Alice Smiley.  At approximately 2:00 a.m. on December 29, 2007, Currie was playing a video game with his six-year-old daughter when he heard a vehicle outside.  He looked out the window and saw Travis Goodwin parking Smiley's van across the street.  Currie then resumed playing a game with his daughter.  Approximately 20 minutes later, he heard gunshots.  Currie testified that he ushered his daughter into a back room and then peeked out the front window.  He saw two men backing away from Goodwin's van, one carrying an assault rifle, the other a handgun.  He also saw a black Dodge Charger and identified the driver of the Charger as Wright.  He identified the man carrying the assault rifle as Shondell Dalton, or "Black."  He identified the other man as Patrick Pickett, also known to him as "Worm."  Currie testified that Black wore a ski mask, but he could nevertheless identify him because he knows how Black walks and moves.  Pickett also wore a ski mask that covered his entire face.  He recognized Pickett because of Pickett's unusually large head.  Currie testified that Wright remained seated in the driver's seat and was not wearing a mask.  After the Charger left the scene, Currie went to Smiley's house to inform her that her son had been shot.  Currie testified that he did not identify Wright as the driver of the vehicle, or Pickett and Dalton as the gunmen when questioned by police on the day of the shooting because he feared for his own safety.

On January 27, 2008, Currie was arrested in connection with an outstanding traffic warrant unrelated to Goodwin's shooting.  Currie believed that he was taken to the police station because police considered him a suspect in the shooting.  This time, he identified

Wright as the driver of the vehicle and Pickett and Dalton as the shooters.  He also identified these individuals in photographs shown to him by Sergeant Diaz.  On January 30, 2008, Currie testified at an investigative subpoena hearing with the prosecutor and Sergeant Diaz.  At that time, he indicated he had doubts about whether Wright was the driver of the vehicle.

Currie also testified about the fire that destroyed Pickett's house.  According to Currie, just before Christmas, Wright asked him to burn down Pickett's drug house in exchange for $100.  He agreed to the deal although he knew that Wright intended for Pickett to think that Goodwin had burned the house down.  Currie also testified that his father and girlfriend conveyed an offer purportedly made by Wright for money if Goodwin did not testify at Wright's trial.

Sergeant Gary Diaz testified that he was the police officer in charge of this case.  He had Currie detained on traffic warrants on January 27, 2008.  Currie identified Wright as the driver of the vehicle and Dalton and Pickett as the shooters.  Currie never mentioned that any of the men were wearing a ski mask.  When he testified about the ski masks at the preliminary examination, it came as a complete surprise to Diaz.  Currie told Diaz that he did not see Pickett with a gun in his hand.

Dr. Lokman Sung, assistant medical examiner at the Wayne County Medical Examiner's Office, testified that he performed an autopsy on Travis Goodwin on January 10, 2008.  He identified the cause of death as eight gunshot wounds.

Wright presented no witnesses in his own defense.

6

## II.  Procedural History

Following a jury trial in Wayne County Circuit Court, Wright was convicted of first-degree murder and carrying a concealed weapon.  On October 20, 2008, he was sentenced to life imprisonment for the first-degree murder conviction and 2-5 years' imprisonment for the carrying a concealed weapon conviction.

Wright filed a claim on appeal in the Michigan Court of Appeals on November 17, 2008.  He filed a brief on appeal through counsel on May 28, 2009, and a pro per supplemental brief on August 19, 2009.  On December 14, 2009, the trial court granted appellate counsel's motion to withdraw and appointed the State Appellate Defender Office as substitute appellate counsel.  Substitute counsel moved to strike the brief previously submitted by assigned counsel because it omitted several relevant issues, and to replace it with the brief filed by substitute counsel.  The trial court granted the motion.  Substitute counsel also filed a motion to remand to the trial court for an evidentiary hearing on this issue:

> Defendant Wright was denied his state and federal constitutional right to the effective assistance of counsel, where trial counsel failed to object to the out-of-court statements to Officer Thomas on constitutional grounds, failed to request a limiting instruction regarding the jury's use of hearsay evidence, failed to request a cautionary instruction on the unreliability of accomplice testimony, and failed to object to the prosecutor's closing argument.

The Michigan Court of Appeals denied the request for a remand.  *People v. Wright*, No. 288975 (Mich. Ct. App. Apr. 16, 2010).

Wright's appeal of right in the Michigan Court of Appeals raised these claims: (i) admission of victim's hearsay statements to his mother and Officer Thomas violated due process and trial court committed plain error in failing to give a limiting instruction; (ii) admission of victim's out-of-court statements to Officer Thomas violated the Confrontation Clause; (iii) trial court's failure to instruct the jury that it should view Currie's testimony with caution denied Wright his right to present a defense; (iv) prosecutor committed misconduct; and (v) trial counsel was ineffective. Wright raised these additional claims in a pro per brief: (i) perjured testimony was presented at trial; (ii) prosecutorial misconduct; (iii) references to accomplices who were not part of case violated due process; (iv) Wright should have been charged as an accessory after the fact; and (v) ineffective assistance of counsel. The Michigan Court of Appeals affirmed Wright's convictions. *People v. Wright*, No. 288975, 2010 WL 5373811 (Mich. Ct. App. Dec. 28, 2010).

Wright filed an application for leave to appeal in the Michigan Supreme Court. He raised the same claims raised in the Michigan Court of Appeals. The Michigan Supreme Court denied leave to appeal. *People v. Wright*, 489 Mich. 973 (2011).

Wright then filed the pending habeas petition through counsel, raising these claims:

I.  The trial court violated due process by admitting the hearsay statements of the deceased victim to his mother and to Officer Thomas. Moreover, the trial court committed plain error by failing to give a limiting jury instruction on the use of the same.

II.     The admission of out-of-court statements violated Petitioner's right to confrontation.

III.    The trial court committed plain error in failing to instruct the jury that it should view Mr. Currie's testimony with caution as he was an accomplice to the crime.

IV.     Prosecutorial misconduct denied Petitioner his right to a fair trial.

V.      Petitioner was denied the effective assistance of counsel by his counsel's failure to object to the out-of-court statements on constitutional grounds, failure to request limiting instructions, failure to request accomplice instruction, and failure to object to the prosecutor's closing argument.

VI.     The principal witness, Dawayne Currie, committed palpable perjury and therefore there is constitutionally insufficient evidence to support the verdict.

### III.  Standard of Review

This habeas petition is reviewed under the exacting standards set forth in the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132,

110 Stat. 1214 (Apr. 24, 1996).  Under AEDPA, a federal court cannot grant habeas relief

with respect to any claim adjudicated on the merits in a state-court proceeding unless the

state adjudication of the claim either:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1), (2).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a

rule that contradicts the governing law set forth in [Supreme Court cases]' or if it

9

'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam), quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). "[T]he 'unreasonable application' prong of the statute permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) quoting *Williams*, 529 U.S. at 413. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S.86, 101 (2011), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal. . . . As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87 (internal quotation omitted).

To obtain relief under § 2254(d)(2), a petitioner must show an unreasonable determination of fact *and* that the resulting state court decision was "based on" that unreasonable determination. *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2012).

10

Lastly, a federal habeas court must presume the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV.  Discussion

### A.  Ineffective Assistance of Trial Counsel

Wright argues that his trial counsel rendered ineffective assistance by failing to object to the admission of Goodwin's out-of-court statements to Officer Thomas on the ground that their admission violated the Confrontation Clause. He further argues that the state court's holding that his attorney did not render ineffective assistance was an unreasonable application of *Strickland*.

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance." *Id.* at 689. This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687.

To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

11

would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.  A court's review of counsel's performance must be "highly deferential."  *Id.* at 689.  Habeas relief may be granted only if the state-court decision unreasonably applied the standard for evaluating ineffective-assistance-of-counsel claims established by *Strickland*.  *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009).  "The question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect but whether that determination was unreasonable – a substantially higher threshold."  *Id.* at 123 (internal quotation omitted).

Wright argues that counsel was ineffective in failing to object to admission of Goodwin's statements to Officer Thomas on Confrontation Clause grounds.  Counsel objected only on state law hearsay grounds.  Wright raised this claim on direct review and the Michigan Court of Appeals denied the claim as follows:

> Defendant argues that his trial counsel rendered ineffective assistance by failing to object to Officer Thomas's testimony about Goodwin's out-of-court statements on Confrontation Clause grounds, . . . Even if defendant could overcome the presumption of effective assistance, he has not established that any deficiency was prejudicial.  For the reasons already explained, defendant has not established that the erroneous admission of Goodwin's statements was outcome determinative.

*Wright*, 2010 WL 5373811 at *5.

Because the state court did not decide the question of whether counsel was deficient in his representation, and instead ruled that Wright failed to demonstrate that he was prejudiced by counsel's errors, the Court reviews the deficiency prong of this claim

12

*de novo* and the prejudice prong with AEDPA deference.  *See Rayner v. Mills*, 685 F.3d

631, 638 (6th Cir. 2012) ("When a state court relied only on one *Strickland* prong to

adjudicate an ineffective assistance of counsel claim, AEDPA deference does not apply to

review of the *Strickland* prong not relied upon by the state court.").

To assess whether counsel was deficient in failing to raise a Confrontation Clause

objection, the Court first considers the relative strength of that objection.  In *Crawford v.*

*Washington*, 541 U.S. 36, 68 (2004), the Supreme Court held that out-of-court statements

that are testimonial in nature are barred by the Confrontation Clause unless the witness is

unavailable and the defendant had a prior opportunity for cross-examination regardless of

whether the trial court finds the statements to be reliable.  Goodwin's death clearly made

him unavailable for trial and it is undisputed that Wright did not have an opportunity to

cross-examine Goodwin.  The only remaining question is whether Goodwin's statements

were testimonial in nature.

Statements are testimonial in nature when the primary purpose is "to establish or

prove past events potentially relevant to later criminal prosecution."  *Davis v.*

*Washington*, 547 U.S. 813, 822 (2006).  "Statements taken by police officers in the course

of interrogations are ... testimonial."  *Crawford*, 541 U.S. at 52.  But, the Supreme Court

also made clear in *Davis* and its companion case, *Hammon v. Indiana*, that not all

statements made to police officers are testimonial.  *Davis*, 547 U.S. at 822.  *Davis*

concerned statements made to a 911 operator by a domestic assault victim while the

assailant was still in her home.  *Id.* at 817.  The Court found those statements non-

13

testimonial because they were made "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency." *Id.* at 822.  In contrast, in *Hammon*, police responded to a domestic disturbance and were told by the wife that "nothing was the matter." *Id.* at 819.  Police placed the husband in a separate room while the wife completed an affidavit describing an altercation that occurred before the police arrived. *Id.* at 820.  The Court held that the statements made by the wife in *Hammon* were not made during an emergency and were therefore testimonial. *Id.* at 830.  The Court further explained: "In *Davis*, [the victim] was speaking about events as they were actually happening, rather than describing past events," *id.* at 828, while in *Hammon*, the declarant was separated from the defendant and described events that occurred in the past and the police questioning "took place some time after the events described were over." *Id.* at 830.

In this case, Goodwin was not in any immediate danger or in the midst of an ongoing emergency when he flagged down Officer Thomas.  That Goodwin flagged down a police officer and volunteered his statement does not alter the testimonial nature of his statement.  Out-of-court statements "can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the declarant about statements taken for use at trial" regardless of whether they are formal or informal statements. *Michigan v. Bryant*, 562 U.S. 344, —, 131 S. Ct. 1143, 1155 (2011).  As the Sixth Circuit Court of Appeals

observed, the danger may be even greater for volunteered informal statements than for those elicited by formal interrogation:

> Indeed, the danger to a defendant might well be greater if the statement introduced at trial, without a right of confrontation, is a statement volunteered to police rather than a statement elicited through formalized police interrogation.  One can imagine the temptation that someone who bears a grudge might have to volunteer to police, truthfully or not, information of the commission of a crime, especially when that person is assured he will not be subject to confrontation. ... If the judicial system only requires cross-examination when someone has formally served as a witness against a defendant, then witnesses and those who deal with them will have every incentive to ensure that testimony is given informally. [] The proper inquiry, then, is whether the declarant intends to bear testimony against the accused.  That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.

*United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

Goodwin's statements to Officer Thomas were made under circumstances which would lead an objective witness reasonable to believe that his statement would be available for use in a later investigation or prosecution of a crime.  There was no immediate threat to Goodwin at the time.  In sum, the statement to Officer Thomas was clearly testimonial and would have been excluded under *Crawford*.

It should have been obvious to defense counsel that an objection under the Confrontation Clause would be sustained.  Wright derived no possible tactical advantage from the admission of this testimony and the risk of prejudice was immense.  Goodwin's statement to Officer Thomas directly pointed a finger (Goodwin's finger) at Wright as someone who might cause him harm.  There is no reasonable strategic justification for

15

counsel to fail to object to the violation of Wright's fundamental right to confrontation. Therefore, the Court finds that counsel's failure to object fell outside the wide range of professionally competent assistance.[2]

The Court now turns to *Strickland*'s prejudice prong.  In finding no prejudice under the *Strickland* analysis, the Michigan Court of Appeals relied on its analysis in the context of the holding that improper admission of hearsay testimony (through Officer Thomas and Smiley) was harmless error.  The Michigan Court of Appeals rejected Wright's argument that "given the questionable reliability of Currie's testimony, the admission of the hearsay testimony tipped the balance against defendant by permitting the jury to make the inference that there was a good reason for Goodwin to be frightened of defendant and for defendant to assist in his murder."  *Wright*, 2010 WL 5373811 at *3. The state court reasoned:

> [A]fter a careful review of the record, we do not agree that the inconsistencies in Currie's testimony were so consequential, or the inadmissible evidence so prejudicial, that one must conclude that more likely than not the jury's assessment of defendant's guilt or innocence turned on the inadmissible evidence.  Currie's initial statement to police was understandably less comprehensive than his later detailed testimony about the incident.  Indeed, the police officer who interviewed Currie after he was arrested on traffic tickets testified that he wanted to interview Currie

---

[2]  An alternative route to fulfilling the purpose of requiring an objection to satisfy comity is to note the state courts were provided with notice and the opportunity to enforce the Constitution by the hearsay objection.  State court judges take an oath or affirmation of office which requires them to "support the Constitution of the United States ..."  Mich. Const. Ar. XI, § 1.  It is not a leap to note that state court judges have an obligation to know the confrontation requirements inherent in a hearsay objection, whether the attorney mentions the Constitution or not.

because there were "holes" in Currie's earlier statement.  The officer
testified that, from the time the officer interviewed Currie and Currie
identified the suspects, Currie had never named anyone other than
defendant as the driver, "Black" as the person with the assault rifle, and
"Worm" as the person with the shiny object getting into the passenger side
of defendant's car.  And, critically, even absent the inadmissible evidence,
the jury would still have heard Currie's testimony that he burned the drug
house knowing that defendant would blame Goodwin for burning the house.
In addition, a firearms identification expert concluded based on the
cartridge casings found at the scene that two guns were involved, and that
one of the types of cartridges could have come from a semi-automatic
assault rifle.  This testimony was consistent with Currie's account of two
shooters.

In addition, after defense counsel's cross-examination of Currie, in which
defense counsel brought out some inconsistencies between Currie's various
statements, the prosecutor forcefully highlighted defendant's involvement
in the shooting:

> Q. Sir, were you asked these questions and did you give these
> answers at the preliminary examination on March 14th under
> oath, sir.
>
> * * *
>
> "Question: Did ... Nigel tell you that they were going to blame
> this on Travis; that he was going to tell Patrick that Travis did
> it?"
>
> Your answer under oath, "Yes."
>
> Was that you answer, sir?
>
> A. Yes.
>
> Q. So when counsel asked you about who set stuff in motion,
> who asked you to burn the house?
>
> A. Nigel.
>
> Q. Who was going to blame Travis for it?

17

> A. Nigel.
>
> Q. Who was in the black Charger when Travis gets shot?
>
> A. Nigel.
>
> Q. And who's with Nigel?
>
> A. Worm, and Black.
>
> Q. And whose house—whose drug house got burned up?
>
> A. Worm's
>
> Q. And it got burned up because who wanted it burned up?
>
> A. Nigel.

In light of the other evidence connecting defendant with the murder, we cannot conclude that it was more probable than not that the inadmissible evidence was outcome determinative.

*Id.* at *3-4.

When determining prejudice, the Court "must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695. A case in which the "verdict or conclusion [is] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696.

The Michigan Court of Appeals' finding that Wright was not prejudiced by admission of Goodwin's out-of-court statements was an unreasonable application of *Strickland*. The evidence implicating Wright was far from overwhelming and rested almost exclusively on the testimony of Currie. Currie's testimony suffered from numerous credibility problems. Currie did not immediately identify Wright as the driver

18

of the vehicle. He first identified Wright as the driver and Pickett and Dalton as the shooters on January 27, 2008, almost a month after the shooting. He made these identifications following his own arrest on unrelated traffic warrants, and only when he believed that police considered him a suspect in the murder.

Currie's testimony about his relationship with Goodwin and Wright also calls his credibility into question. Currie testified that he was good friends with Goodwin. He used his relationship with Goodwin to explain in part the delay in his identification of Wright as the shooter. He explained that he was motivated to finally identify Wright when he learned that Goodwin died because Goodwin had been his friend. Yet, he did not contact police after Goodwin's death. In fact, he did not communicate with police following Goodwin's death until police arrested him on unrelated warrants. Moreover, Currie burned the drug house knowing that his supposedly good friend would be blamed for the fire.

At trial, Currie identified two masked men, Dalton and Pickett as the shooters. He did so despite many factors calling into question his ability to view the suspects: Currie viewed the suspects from inside his home across the street from where their vehicle was parked for approximately fifteen seconds; it was 2:00 a.m.; the nearest streetlight was three houses down; the light inside Currie's home was on; and he was surreptitiously peeking out from behind blinds. The basis for Currie's identification of Dalton and Pickett was so insufficient that the district court would not bind them over for trial. Currie's identification of Dalton and Pickett, in the middle of the night, with no

19

opportunity to see their unmasked faces, certainly raises concerns about his credibility. Indeed, Currie showed that he would lie under oath when he admitted at trial that he testified falsely at the preliminary examination on several facts.

Further impugning Currie's credibility is his testimony that he told Goodwin's mother, Smiley, and other family members that Wright, Dalton and Pickett were responsible for Goodwin's death. Smiley testified that Currie did not relay this information to her and there is no evidence that any of Goodwin's relatives relayed this information to police.

Furthermore, the "other evidence" identified by the Michigan Court of Appeals as supporting a finding that Wright was not prejudiced by this testimony is almost entirely evidence derived from Currie's own testimony. That is, the state court uses the portions of Currie's trial testimony that identify Wright as the driver and the certainty of that identification to support its conclusion that the admission of the victim's statements did not prejudice Wright. However, this analysis depends upon the credibility of Currie, which itself was supported by the victim's out-of-court statements.

If counsel raised a Confrontation Clause objection and if the trial court followed controlling Supreme Court precedent, Goodwin's statements would have been excluded. Had jurors not heard Goodwin's statements to Officer Thomas, there is a reasonable probability that the jury would have changed their assessment of Currie's credibility and their verdict. The state court's conclusion to the contrary is an unreasonable application of *Strickland.*

### B.  Confrontation Clause Violation

Related to his ineffective assistance of counsel claim, Wright raises a stand-alone claim that habeas relief should be granted because the admission of Goodwin's out-of-court statements to Officer Thomas violated his rights under the Confrontation Clause.

Respondent argues that this claim is procedurally defaulted because the Michigan Court of Appeals relied on an adequate and independent state court procedural rule in denying this claim – trial counsel's failure to object on Confrontation Clause grounds. Federal habeas relief is precluded on claims that were not presented to the state courts in accordance with the state's procedural rules.  *See Wainwright v. Sykes*, 433 U.S. 72, 85-87 (1977).  The doctrine of procedural default is applicable when a petitioner fails to comply with a state procedural rule, the rule is actually relied upon by the state courts, and the procedural rule is "independent of the federal question and adequate to support the judgment."  *Walker v. Martin*, 562 U.S. 307, —, 131 S. Ct. 1120, 1127 (2011) (internal quotations omitted).  A federal court may excuse procedural default and address the merits of a habeas claim if the petitioner establishes cause and prejudice or if a petitioner can show that failure to consider a claim will result in a fundamental miscarriage of justice.  *Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

To establish "cause," a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Haylim v. Mitchell*, 492 F.3d 680, 690-91 (6th Cir. 2007), *quoting Murray*, 477 U.S. at 488. "Prejudice . . . requires a showing that errors at trial 'worked to [the petitioner's]

actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" *Id.* at 690-91 *quoting United States v. Frady*, 456 U.S. 152, 168 (1982).

Wright asserts ineffective assistance of trial counsel to excuse his procedural default. The Court has found that counsel rendered constitutionally ineffective assistance and that Wright was prejudiced by counsel's error. Therefore, he has shown cause and prejudice to excuse the default and the Court is free to address the merits of this claim.

The Court has found that Goodwin's statements to Officer Thomas were testimonial and that Wright had no prior opportunity to cross-examine Goodwin. Thus, a Confrontation Clause violation occurred. A violation of the Confrontation Clause is subject to harmless error analysis. *See Lilly v. Virginia*, 527 U.S. 116, 140 (1999). On habeas review, to determine whether an error is harmless a court must ask whether the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). The Court, however, need not undertake that analysis here because "[t]he prejudice prong of the ineffective assistance analysis subsumes the *Brecht* harmless-error review." *Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009), citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995). *See also Rodriguez v. Montgomery*, 594 F.3d 548, 551 (7th Cir. 2010) ("When a petitioner must show prejudice, as when arguing that counsel furnished ineffective assistance of counsel, it is unnecessary to show prejudice a second time through the lens of *Brecht*."); *Avila v. Galaza*, 297 F.3d 911, 918 n. 7 (9th Cir. 2002) ("We need not conduct a harmless error review of Strickland

22

violations under *Brecht* ... because the Strickland prejudice analysis is complete in itself;

there is no place for an additional harmless-error review") (internal quotation omitted).

Because Wright satisfies the prejudice prong of *Strickland*, the error is not harmless under

the *Brecht* standard.  *Hall*, 563 F.3d at 236 ("If [petitioner] can show that he was

prejudiced by his attorney's failure, . . . then he necessarily satisfies *Brecht*. . . ").  Habeas

relief is granted on this claim.

### V.  Conclusion

Accordingly, IT IS ORDERED that the petition for a writ of habeas corpus is

CONDITIONALLY GRANTED.  Unless a date for a new trial is scheduled within 120

days, Petitioner must be unconditionally released.  Because the Court concludes that the

claims that counsel was ineffective in failing to raise a Confrontation Clause objection

and the Confrontation Clause violation are sufficient to warrant habeas corpus relief, the

Court need not address Petitioner's remaining claims.


S/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: May 28, 2015

I hereby certify that a copy of the foregoing document was served upon parties/counsel of
record on May 28, 2015, by electronic and/or ordinary mail.

S/Catherine A. Pickles
Judicial Assistant